# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 06-CV-6686 (JFB) (ARL)

————————————————

## GERALDINE MELNICK AND LONNIE SCHWIMMER,

Plaintiffs,

VERSUS

## CARY PRESS,

Defendant.

————————————————

**MEMORANDUM AND ORDER**
August 12, 2011

————————————————

Joseph F. Bianco, District Judge:

Plaintiffs Geraldine Melnick ("Melnick") and Lonnie Schwimmer ("Lonnie") (collectively "plaintiffs") bring this diversity action against Cary Press ("Press" or "defendant"), seeking, *inter alia*, a partition of certain properties that Melnick claims to own jointly with defendant, the imposition of a constructive trust on another property, damages for defendant's alleged wrongful conversion of certain funds, a judgment in favor of plaintiff for the fair market rental value of defendant's use and occupancy of certain property after defendant's alleged ouster of plaintiff from that property, and punitive damages resulting from defendant's alleged wrongful conversion of funds and fraudulent taking of certain property. These claims each stem from the termination of Melnick's and Press's quasi-marital relationship in August 2006.

A bench trial was held on September 20, 22, and 23, 2010, and on November 12, 2010. Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a), and concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that: (1) the property at 15 Ohio Avenue should be partitioned and sold, and the proceeds should be divided equally between Melnick and Press, after payment of any remaining liens or encumbrances; (2) neither Press nor Melnick is entitled to reimbursement for any payments of carrying costs or other expenses associated with 15 Ohio, or for any rental income allegedly received from the property; (3) Press did not oust Melnick from 15 Ohio; (4) the Delray Beach property should be partitioned and sold and the proceeds should be divided equally between Melnick and Press, after payment of any outstanding mortgages,

liens, or encumbrances; (5) Press is not liable to Melnick for conversion of insurance proceeds related to the Delray Beach property; (6) Press is not liable to Melnick for conversion of funds from a home equity line of credit on the 15 Ohio property; and (7) plaintiffs are not entitled to a constructive trust on the property located at 16 Nevada Avenue. Moreover, given the Court's findings, plaintiffs' claim for punitive damages regarding the fraudulent taking of the Delray Beach insurance proceeds and the 16 Nevada property is rendered moot.

## I. BACKGROUND

On December 20, 2006, plaintiffs filed the complaint in this case, seeking: (1) a partition of real property known as and located at 15 Ohio Avenue, Long Beach, New York (the "15 Ohio" property); (2) a partition of real property known as and located at 914 Foxpointe Circle, Delray Beach, Florida (the "Delray Beach" property); (3) an accounting for both of the aforementioned properties; (4) the imposition of a constructive trust on real property known as and located at 16 Nevada Street, Long Beach, New York (the "16 Nevada" property); (5) the partition of the 16 Nevada property; (6) an accounting for the 16 Nevada property; and (7) damages for defendant's alleged wrongful conversion of insurance proceeds and financing placed upon the properties. Defendant answered on February 16, 2007, and counterclaimed against Melnick for: (1) 50% of the maintenance expenses paid on 15 Ohio, on property located at 17 Ohio Avenue, Long Beach, New York ("17 Ohio"), and on the Delray Beach property, and (2) an accounting of monies expended by Melnick for the maintenance expenses at 15 Ohio, 17 Ohio, and Delray Beach. Defendant also counterclaimed against Melnick and Lonnie for wrongful conversion of property from the Delray Beach property.[1]

On October 30, 2009, plaintiffs filed a motion for summary judgment. Press opposed the motion and cross-moved to dismiss plaintiffs' claim for the imposition of a constructive trust on 16 Nevada. On April 14, 2010, the Court held oral argument on the motions and denied both motions for the reasons set forth on the record. On April 28, 2010, Press moved for reconsideration of the Court's denial of his motion to dismiss the constructive trust claim. The Court denied Press's motion for reconsideration in an oral ruling made on June 10, 2010. On July 29, 2010, Press filed a motion for partial summary judgment. The Court orally denied defendant's motion on September 20, 2010 and memorialized its rulings in a written order issued on October 1, 2010. The Court conducted a bench trial on September 20, 22, and 23, 2010, and on November 12, 2010.

## II. FINDINGS OF FACT

The following section constitutes the Court's findings of fact[2] pursuant to Federal

---

[1] The Court notes that neither the counterclaim for reimbursement of payments made in connection with 17 Ohio nor the counterclaim for conversion of property from Delray Beach were included in the pre-trial order, and the Court deems both of these counterclaims to be abandoned. In any event, the Court finds that Press has not submitted sufficient credible evidence to support either of these claims.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice-versa. For example, in order to avoid repetition and for ease of reference to the reader, the Court has elaborated on certain findings of fact in the Conclusions of Law section to explain its reasoning.

Rule of Civil Procedure 52(a)(1). These findings of fact are drawn from witness testimony at trial ("Tr."), the parties' trial exhibits ("Tr. Ex."), and undisputed facts submitted by the parties in the joint pre-trial order ("PTO").[3]

A. Melnick's and Press's Relationship

Melnick and Press began dating in or around the early 1980s. (Tr. 104:23-105:13; 306:18-307:7.)[4] Prior to dating Press, Melnick was separated from her husband, whom she later divorced and with whom she had two children, Eric and Lonnie Schwimmer. (Id. 105:1-13.) In or around 1994, Melnick and Press began living together at the 15 Ohio property (id. 106:21-22, 109:16-110:3, 308:14-17), which Press had purchased in or around 1985. (Id. 307:21-22.) During the twelve years that they lived together, Press and Melnick were more than mere roommates—Press testified at trial that their relationship was sexual in nature (id. 387:15-18), and Melnick described that they "lived like a married couple," including sharing the same bed, socializing together, and interacting with each other's families. (Id. 257:21-258:8.)

The Court finds that Melnick and Press had a quasi-marital relationship based upon the testimony cited in this section, which the Court found credible. For example, Melnick testified that she cooked for Press, cleaned the house, and assisted Press after he was injured in several accidents, including by taking him to the doctors, dressing his wounds, putting on his shoes and socks, helping him into the shower, and getting his medicine. (Id. 110:8-111:1.) Press acknowledged that Melnick performed many of these activities and that she helped to maintain the household at 15 Ohio. (Id. 37:24-38:13; 39:9-14.) Press, Melnick, and Melnick's children spent all holidays together, including Thanksgiving, Hanukkah, Father's Day, Mother's Day, and birthdays, and both of Melnick's sons testified that they considered Press to be a father-figure to them. (Id. 70:5-71:19; 192:24-193:1.) Lonnie Schwimmer testified that he brought Press gifts for Father's Day and that Press was part of Lonnie's wedding. (Id. 71:25-72:14, 75:12-19.) Press also testified that he bought many gifts for Melnick (id. 36:5-8), and Melnick described that they had "a typical married relationship even though we didn't have the papers. We did everything together as a family with and without my children. We acted like a regular married couple. We went on vacations together, we went to affairs together, we went out, we had friends, we do everything I guess regular people do without the ring." (Id. 104:16-22.) During their relationship, Melnick was listed as the sole beneficiary of Press' last will and testament. (Id. 36:25-37:9.)

Melnick also helped Press' family members, including Press' brother, his brother's girlfriend, and his mother, by, for example, bringing them food and helping them through medical treatments. (Id. 112:2-13; 418:8-20.) In addition, when Melnick's son, Eric Schwimmer, was

---

[3] The Court notes that the parties here each submitted a separate Proposed Joint Pre-Trial Order. Defendant's PTO, however, incorporated much of plaintiffs' PTO, and, therefore, unless otherwise indicated, the undisputed facts cited herein are drawn from plaintiffs' PTO.

[4] Press testified that, after a period of dating and seeing other people, he and Melnick got "back together" after Hurricane Gloria. (Tr. 306:22-307:7.) The Court takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of the fact that Hurricane Gloria occurred in September 1985. *See* http://www.hpc.ncep.noaa.gov/tropical/rain/gloria1985.html.

undergoing cancer treatment, Press cleaned Eric's wounds and helped to take care of him. (*Id.* 37:10-19; 111:23-112:1.) Press also took care of Melnick after Melnick had back surgery. (*Id.* 111:22-23.)

With regard to their finances, both Press and Melnick paid a portion of their living expenses, but neither kept track of precisely which bills or what amounts were paid by whom. (*Id.* 34:3-8; 39:12-14; 112:19-24; 222:14-22.) Melnick also helped Press pay off a mortgage that Press held on real property he owned at 17 Ohio Avenue in Long Beach, New York ("17 Ohio"). By way of background, at some point during their relationship, Press transferred a 50% interest in the 17 Ohio property to Melnick. (*Id.* 36:9-15.) Melnick did not pay Press any money for this transfer, which Melnick testified, and the Court credited, was made as a gift.[5] (*Id.* 106:25-107:2; 254:9-15.) Press also held a $121,790 mortgage on the 17 Ohio property, which Press took out to pay for renovation of the property at 15 Ohio. (*Id.* 370:19-371:7.) After Melnick became a co-owner of the 17 Ohio property, she made approximately $40,000 in payments toward this mortgage. (Pl.'s Tr. Ex. 15; Tr. 215:22-24; 221:11-22; 314:19-315:1.) Subsequently, however, Melnick's name was taken off of the deed at 17 Ohio because, as described by Melnick, "[Press] wanted me to take my name off the deed because he said my credit wasn't good, since we did all the renovations at 15 Ohio and I built up all of these debts and if he wanted to purchase something else for us together, then it would be better for me to have my name off of this house." (Tr. 222:2-8; 38:11-19.)

Ultimately, on August 29, 2006, after living together for twelve years, Melnick decided to end her relationship with Press and move out of the house at 15 Ohio. (*Id.* 232:3-6.) Melnick testified that this decision was prompted by a change in Press's behavior after he was involved in several accidents and began taking pain medication. Specifically, Melnick described that Press had become irrational and verbally abusive in the final two years of their relationship, and that he "constantly" screamed, was "very angry at the world," and had become a recluse. (*Id.* 232:14-233:6.) Thus, according to Melnick, "I left him because at this point I saw that all his erratic behavior, and all his craziness, and all his mood swings, and all his drug taking was making him very irrational, and I was very afraid of him." (*Id.* 232:8-11.) Similarly, Eric Schwimmer, Melnick's son, testified that Press was "very nasty" and "put everybody down," (*id.* 202:25-203:2), and Harriet Kovel ("Kovel"), a long-time friend of Melnick's, testified that defendant's personality had changed and his behavior was "erratic." (*Id.* 169:20-23.)

Prior to Melnick's move, she packed many of her belongings, including her summer clothing, her art supplies, and her bike, and had those belongings brought down to Florida by truck. (*Id.* 237:14-16; 266:6-10; 266:18-267:1.) In addition, the record is clear that on the day of Melnick's move, Melnick did not leave by herself but instead had Press drive her to her friend's house. (*Id.* 237:17; 266:14-16; 339:14-25.)[6]

---

[5] Notably, Press did not provide any evidence or testimony disputing the characterization of this transfer as a gift.

[6] As discussed in more detail in the Conclusions of Law, although Press's mood may have become more erratic as a result of his accidents and need for pain medication, the Court finds that the facts and circumstances were not sufficient to constitute ouster; rather, the Court finds that Melnick left voluntarily because of

## B. 15 Ohio

Press purchased the home located at 15 Ohio in or about 1985 for approximately $185,000. (*Id.* 18:11-17) At the time of purchase, Press paid a 10% down payment and took out a mortgage on the property for approximately $164,000. (*Id.* 21:13-22:4.)

Subsequently, in 1994, Melnick and Press decided to move in together at 15 Ohio. (*Id.* 106:20-22; 109:16-110:4.) According to Melnick, she and defendant made the decision to cohabitate because Melnick's children "were older and they were out and basically almost on their own, and we felt that it would be better to live in one place." (*Id.* 110:24-110:3.) Up until that point, Melnick had been living in her home in Woodmere, New York, which she sold prior to moving in with defendant. (*Id.* 106:21-24; 308:4-17.)

Approximately two years later, in April 1996, Melnick became a co-owner of the 15 Ohio property with Press. (*Id.* 106:13-21.) Specifically, as reflected on the deed of 15 Ohio, Melnick and Press are joint tenants with rights of survivorship. (Pl.s' Tr. Ex. 13; Tr. 18:4; 107:11-22.) The deed also states that Melnick was placed on the deed in consideration of $157,630. (Pl.'s Tr. Ex. 13; Tr. 113:5-8.) Although Melnick admitted that she never gave Press $157,630 "in that exact amount," (Tr. 113:9-10), she testified at trial that she gave Press $70,000 in cash and then additionally paid over $200,000 for renovations of the 15 Ohio property. (*Id.* 113:18-22; 136:22-24.) Regarding the $70,000 payment, Melnick noted that this money was intended to go toward the renovation of the 15 Ohio house

and that she did not pay this amount on the day she signed the deed, but instead gave Press the money sometime thereafter. (*Id.* 113:11-22; 254:20-23.) Melnick denied that Press promised he would put her on the deed if she paid him half of the value of the property and, instead, claimed that Press told her he was giving her a half interest in the property as a gift. (*Id.* 254:16-23; 260:9-12.) In particular, regarding the reason why Press transferred an interest in 15 Ohio to her, Melnick testified:

> Cary told me that he wanted me to have security and he wanted to give me half and it was the day before his birthday. He wanted to give me half because we sold my house and didn't want to live there and he needed money, I know, for the renovation. But it had nothing to do with the financial deal. . . . There was never an agreement that I was going to pay him any money for it.

(*Id.* 297:17-298:1.) In contrast, Press acknowledged that Melnick paid him $70,000, but he testified that he understood that Melnick was paying him for a 50% interest in the property and that he considered them to be business partners in the deal. (*Id.* 308:24-309:18; 387:25-388:2.) Press also testified that he understood that Melnick would pay half of the expenses for the property and would pay for half of the renovation costs. (*Id.* 309:15-16; 310:15-17.)

As to the renovation payments, Melnick introduced a number of checks at trial made payable to a variety of contractors and workers involved in the construction and renovation of the 15 Ohio property. (Pl.'s Tr. Ex. 6.) The parties do not dispute that the total cost of the renovations was approximately $204,000, or that Melnick wrote checks totalling this amount. (Tr.

---

these problems in the relationship. In short, there is insufficient credible evidence of verbal or physical abuse to warrant a claim of ouster against Press.

219:5-9.) Press also does not dispute that the $204,000 in renovation-related payments were separate from, and in addition to, the $70,000 that Melnick paid directly to Press. (*Id.* 219:18-25.) However, the parties do dispute where the $204,000 came from and who contributed which amounts to the renovation. Specifically, Melnick testified that she put approximately $80,000 to $90,000 worth of charges for the renovations on eight to ten different credit cards, and that she also contributed to the renovation from her savings, from money she received through the sale of her Woodmere house, and from her work salary. (*Id.* 137:5; 250:1-14; 251:3-10.) Press, in contrast, claims that he paid "a couple hundred thousand" dollars for the renovation and that he "was putting in most of the money." (*Id.* 312:15-24; 59:14.) These funds, he testified, came from settlements from several accidents he was in, as well as from his savings, from money he borrowed from others, and the $70,000 that Melnick had paid him. (*Id.* 312:15-24.) He also contends that while Melnick may have written checks from her account for the renovation, those payments were made using money that Press gave Melnick. (*Id.* 50:9-11; 318:3-319:11.)

After carefully considering the evidence introduced at trial, the Court finds that both parties contributed at least some amount toward the renovation, but that neither party kept sufficient documentation (or provided detailed enough testimony) in order for the Court to accurately determine their precise contributions. Instead, the Court finds that, because of the quasi-marital nature of the relationship, both Melnick and Press were contributing towards renovations and other expenses for 15 Ohio without keeping track of such contributions. For example, although Press claims that Melnick wrote checks for the renovation with money that Press gave her and that Press was the one who contributed most of the money, Press nevertheless admitted that Melnick contributed "some money" to the renovations and that, in fact, he was "not exactly sure where she got what" money. (*Id.* 50:5-14.) Moreover, Press stated that some of the funds he gave back to Melnick came from the $70,000 that she had paid to him. (*Id.* 312:19-24; 319:12-16.) Melnick similarly acknowledged that Press gave her "some money" for the renovation of 15 Ohio, although she could not recall how much Press gave her. (*Id.* 251:11-17.) Press also submitted a number of checks as evidence at trial demonstrating that he gave funds to Melnick. (Def.'s Tr. Ex. Z.) However, only four of these checks were written in 1996 and 1997, when the renovations took place. (*Id.* at Tab 9; *see also* Tr. 295:23-296:2; 310:3-14; 312:2-6.) Additionally, even assuming *arguendo* that each of these checks were considered reimbursement for renovation costs, the checks only total $39,000, which is far short of the $204,000 total cost for the renovation at 15 Ohio.[7]

_____

[7] Press also submitted a number of checks that he wrote to himself and claimed were payments to Melnick. Other than Press's testimony, however, there is no evidence that these payments were actually made to Melnick—the memo lines in the checks are blank, and the checks were not correlated to any specific renovation payments. In addition, two of these checks were written prior to the time that Melnick was placed on the deed for 15 Ohio. The Court finds the testimony of Press on this issue insufficient to enable the Court to conclude that these payments were made to Melnick. Therefore, the Court has not considered any checks made payable to "Cary Press" in its analysis above. In any event, even if the Court were to credit Press's testimony that these payments were intended for Melnick, the post-April 1996 checks only total $4,800, which is still below the total cost for the renovation.

Furthermore, both Melnick and Press admitted that they did not keep track of money coming into or out of the property, and neither kept a log as to who made which payments. (Tr. 59:6-17; 112:19-24.) Indeed, Melnick testified that, as a general matter, "we lived as a couple and I helped. . . . I never watched the money. If he wanted something and I had it, I gave it to him. If I needed something and he had it, he gave it to me." (*Id.* 222:17-22.) Finally, despite his testimony to the contrary, Press testified that he was "positive" that plaintiff had paid for her interest in 15 Ohio. (*Id.* 58:23-59:1.)

C. 15 Ohio Home Equity Line of Credit

In 2005, Press took out a $250,000 Home Equity Line of Credit ("HELOC") on the 15 Ohio property. (*Id.* 22:5-12; 23:11-24.) Melnick was a co-owner of the property at that point, and, as such, Press testified that Melnick had to approve the HELOC since her name also appeared on the deed for the property. (*Id.* 22:5-12; 64:3-9.) Although the HELOC paperwork admitted at trial did not contain Melnick's signature (Pl.'s Tr. Ex. 2; Tr. 23:8-10), Melnick admitted during her testimony that she signed for the HELOC on the 15 Ohio property. (Tr. 256:12-18.) Specifically, testimony elicited by Melnick's attorney revealed that, although Press was the only one who signed the note for the HELOC, Melnick did, in fact, sign the mortgage for the home equity line. (*Id.* 373:22-374:1.)

Prior to taking out the HELOC, Press had a discussion with Melnick wherein he explained that the reason he wanted to take out the HELOC was to pay for day-to-day living expenses because Press was not working at the time and was receiving federal Social Security Disability benefits. (*Id.* 55:19-24; 66:22-67:23.) In particular, Press credibly testified that he told Melnick that they "should take out a home equity line

of credit so that if we needed the money to live on because I wasn't able to work, that we would have access to it. And while my credit was still very good and things were okay, I didn't have any problems, to do it at that point." (*Id.* 313:10-16.) Press also credibly testified that while some funds from the HELOC were used to pay off the pre-existing mortgage that Press held on 15 Ohio (*Id.* 28:18-29:2; 312:25-313:3), most of the funds were used for living expenses. (*Id.* 313:4-6.) Press also noted, and the Court credited, that Melnick received some of the home equity line funds. (*Id.* 39:15-18.)

Melnick, however, introduced evidence that Press also used some of the funds to pay for racehorses and related expenses. Specifically, Melnick introduced a number of checks written by Press to pay, for example, veterinary bills, a horse trainer, racing authority fees, and insurance for a racehorse. (*Id.* 51:22-54:23.) Press acknowledged that he was spending thousands of dollars from "a home equity line of credit" on racehorses (*id.* 56:7-10), but he claimed at trial that these payments were made from a HELOC that he took out on property located at 16 Nevada. (*Id.* 376:17-20.) The Court finds that there is insufficient credible evidence in the record for the Court to conclude that the funds for racehorses and related expenses came from the HELOC for 15 Ohio, rather than 16 Nevada.[8]

Finally, Melnick never paid any money back on the HELOC because she "never

_____

[8] In any event, as noted in more detail in the Conclusions of Law, even assuming *arguendo* that these expenditures were from the HELOC for 15 Ohio, the Court finds that Melnick was aware of the HELOC and the use of the funds for various housing and other expenses incurred by both Melnick and Press.

could even write a check on that loan" and "never saw a bank statement on that loan." (*Id.* 257:5-7.)

## D. 16 Nevada

In or around 1995 or 1996, Lonnie Schwimmer rented an apartment located at 16 Nevada. (*Id.* 77:24-78:7.) While he was living there, Lonnie claims to have told the then-owner of 16 Nevada, Patrick Healy ("Healy"), that he was interested in buying the property if Healy wanted to sell it. (*Id.* 81:19-23.) Similarly, Press also claims to have been interested in purchasing 16 Nevada for many years. (*Id.* 352:16-18.)

In or around late 1998 or early 1999, Healy called Lonnie and offered Lonnie the property. (*Id.* 82:6-9; PTO 7.XV) Lonnie was "very excited about the opportunity," and approached the CFO of his company to help him "double-check what I thought seemed like a great deal." (Tr. 82:10-18.) Lonnie also called his mother to inform her about the deal. (*Id.* 82:24.) Approximately thirty minutes after Lonnie spoke with his mother, Press allegedly called Lonnie in a panic, stating that Lonnie couldn't buy the property because 16 Nevada was for Press and Melnick for their retirement. (*Id.* 82:24-83:7.) Lonnie testified that he "kind of like threw my hands up there," and that the discussions between Press, Melnick, and Lonnie continued for several days. (*Id.* 83:8-10.)

Ultimately, on July 28, 1999, Lonnie purchased the property on Press's behalf. (*Id.* 85:11-86:1; 353:18-22.) It is undisputed that, although Lonnie held a mortgage for the property in his name, Press reimbursed Lonnie for all mortgage payments and Lonnie did not, in fact, make any payments himself toward the mortgage. (*Id.* 47:7-14; 84:4-7.) Press also paid Lonnie $65,000 for closing costs and paid every other expense

for the property, including taxes and utility payments. (*Id.* 273:11-18; 356:7-13; 357:6-16; 390:8-11; Def. Tr. Ex. H; PTO 7.XIX.) Indeed, Lonnie testified that "everything was handled by [Press]," and Lonnie was not even sure whether there was homeowners' insurance on the property. (Tr. 90:13-15.) Lonnie also acknowledged that every payment he ever made in connection with 16 Nevada was reimbursed, and he did not have any out-of-pocket expenses for the property. (*Id.* 91:24-92:6.) For example, although it is disputed whether Lonnie did or did not loan Press $10,000 for the down payment (*id.* 83:25-84:1; 273:11-16; 356:4-6),[9] even if such money was loaned, plaintiffs acknowledge that this amount was repaid by Press within eight months to one year of the purchase of the property. (*Id.* 88:1-5; 274:16-20; 95:24-96:7.) Finally, it is undisputed that three years after purchasing the property, Lonnie transferred 16 Nevada to Press on March 5, 2002. (*Id.* 354:9-355:4.)

Plaintiffs and Press dispute, however, why Lonnie transferred the property solely to Press (and not to both Press and Melnick) and what, if any, promises were made by Press to Lonnie prior to the purchase of the property. Specifically, plaintiffs claim that Press promised that he would transfer an interest in 16 Nevada to Melnick and that the only reason the transfer was not made initially to both Press and Melnick was because Press said that Melnick's credit was not good enough to be on the deed. (*Id.* 87:18-25; 269:5-15.) As to the initial promise allegedly made by Press prior to Lonnie's purchase of 16 Nevada, Lonnie

---

[9] Press claims that the $10,000 loan from Lonnie was for the renovations at 15 Ohio, not for the down payment at 16 Nevada. (Tr. 355:24-356:6.)

testified that he was willing to forgo purchasing the house for himself because:

> [B]asically I was getting out of the way of the house for my mother, and he said to me that he promised me that he would put my mom's name on the deed after their credit cleared up because there was always some type of credit issue, and take it back in their name and everything and they were going to retire off the property.

(*Id.* 85:11-20.) Lonnie further claimed that this promise to add Melnick to the property at a later date was reiterated at the time that Lonnie transferred the property to Press, when Press stated again that the reason Melnick was not on the deed was because of her poor credit. (*Id.* 87:18-25; 92:19-94:11.)

Press, however, denies ever having made any agreement with either Lonnie or Melnick regarding the future transfer of 16 Nevada to Melnick. (*Id.* 358:4-16.) Thus, Press denies that Lonnie transferred 16 Nevada to Press in reliance on Press's promise to add Melnick to the deed and, in support of this argument, points to the fact that Press paid all expenses in connection with the property at 16 Nevada. (*Id.* 353:18-358:19.)

Having carefully considered the trial evidence (and as described in more detail in the Conclusions of Law), the Court finds that plaintiffs have failed to provide credible evidence that a promise or agreement existed regarding the future transfer of 16 Nevada to Melnick.

### E. Delray Beach Property

On January 21, 2004, Melnick and Press purchased a house at 714 Foxpointe Circle in Delray Beach, Florida as tenants in common. (PTO 7.VII; Tr. 223:11-20.) As with the property at 15 Ohio, Press testified that he saw his co-ownership of the property with Melnick as a "business deal" and that he told Melnick to "put up half" of the costs for the purchase of the home if she wanted to be "partners" in the deal. (Tr. 320:21-321:4.) Both Press and Melnick were listed as insureds for the property. (*Id.* 41:8-12; 228:23-24.) Although Melnick did not pay for half of the purchase price of the home, Melnick did contribute $9,000 toward the purchase of the property (*id.* 224:6-11; 325:7-10; 386:8-10) and made five payments between February 2004 and June 2004 toward the mortgage on the property, for a total of approximately $10,000. (Pl.'s Ex. 14; Tr. 279:22-280:1; 386:11-13.) Melnick also testified that she paid certain bills for the property, including electric, telephone, cable, and housekeeping bills, although she did not testify regarding how much money she paid toward these bills. (Tr. 280:21-281:1.) Press paid the remaining expenses for the property, including various closing costs associated with the purchase of the property, such as homeowners association dues and various initiation fees. (*Id.* 322:7-16.) However, the last payment made toward the mortgage on the property was made in or around March 2007, and the property is currently going into foreclosure. (*Id.* 324:15-16; 325:6-9.)

In October 2005, Hurricane Wilma caused severe damage to the house, thus requiring Melnick and Press to undergo extensive renovations and repairs on the property. (*Id.* 41:13-15; PTO 7.VIII.) After Melnick and Press submitted insurance claims for the damage, their insurance companies issued checks totaling $214,168.53.[10] One check for $105,657.07

---

[10] Although Melnick testified that the insurance companies paid approximately $240,000 on the claims for damage to the property (Tr. 229:11-

was made payable not only to Press and Melnick, but also to CitiMortgage, who, as the mortgagor for the property, kept possession of these funds and paid out checks from this amount as reconstruction on the property was completed. (Tr. 65:20-66:7; 285:4-9.) In addition, one check for $78,311.46 from Florida Insurance Guaranty Association was inadvertently issued only to Press, even though both Press and Melnick were insureds for the property. (Pl.'s Tr. Ex. 6; Pl.'s Tr. Ex. 7; PTO 7.XII.) Although the insurance company sent a letter requesting that Press return this check so that it could be made payable to both Press and Melnick, Press claims to have never received this letter, given that it was sent to the Florida address, and admits that he deposited this check into his personal checking account. (Pl.'s Tr. Ex. 6; Tr. 46:4-10.) Press testified that he used these funds to pay bills for the repairs of the Delray Beach house. (Tr. 46:11-12.) Of the remaining $30,200, Melnick deposited one check for $7,600 in her account (*Id.* 229:18-19) and gave the remaining checks—which were issued to both Press and her—to Press, who deposited them into his account. (*Id.* 229:20-23; 43:15-17; 44:14-16.)

Neither Melnick nor Press provided conclusive documentary evidence at trial regarding the exact total cost of the repairs of the Delray Beach property. Although Melnick claimed that the total cost of the reconstruction was approximately $110,000, she submitted no receipts to corroborate this

estimation and, in fact, admitted that she had "guesstimated" this figure based on having seen "a lot of the bills" for the repairs when she was down in Florida. (*Id.* 230:8-15; 284:3-16.) Press did not provide an estimate for the total cost of the reconstruction during his testimony, but he did provide receipts totalling approximately $85,325 that he testified represented "not half" of the expenses he incurred in connection with the repairs. (Def. Ex. Z; Tr. 467:4-6.) Press also testified regarding the extensive repairs that were necessary at the Delray Beach property as a result of water and wind damage, including mold and mildew mitigation, replacing the sheetrock, insulation, and air conditioning ductwork, and repairing the roof. (Tr. 328:12-15; 332:24-333:23; 334:17-335:20.) Having carefully considered the evidence at trial, the Court finds credible Press's testimony that all of the insurance proceeds were used to pay for extensive repairs to the home after the hurricane. Other than sheer speculation, Melnick has provided no credible evidence that the proceeds were used for other purposes or to Melnick's detriment.

## III. DISCUSSION

### A. Partition of 15 Ohio and Delray Beach Properties

Melnick is seeking a partition of the 15 Ohio and Delray Beach properties and argues that she should receive 50% of the proceeds of the sale and should not be responsible either for reimbursing Press for the costs of any repairs or expenses or for any outstanding liens or encumbrances on the properties. Press does not dispute that the properties should be partitioned by sale, but he does dispute that the sale proceeds should be divided evenly between Melnick and him. Press does not propose what the division of the proceeds should be, but instead argues that the Court must conduct

14), plaintiff submitted checks totaling only $214,168. Indeed, in the pre-trial order, the parties stipulated that the insurance proceeds for the property equaled $214,168.53. (PTO 7.X.) Therefore, the Court does not credit Melnick's testimony that Press received insurance checks for $240,000, and, instead, the Court finds that the total amount of insurance proceeds paid by the insurance companies was $214,168.53.

an accounting to determine the parties' respective contributions to the property. Press contends that he is entitled to reimbursement to the extent that his contributions were greater than those of Melnick.

As an initial matter, as to defendant's request for an accounting, the Court recognizes that an accounting is a necessary incident to a partition action and, accordingly, has reviewed all of the financial information and other evidence regarding expenditures for the property submitted by both parties in reaching its decision. Having reviewed this financial data, as well as the other evidence presented at trial, the Court finds, first, that defendant has failed to rebut the presumption that the property at issue here should be divided equally, and, second, that defendant is not entitled to reimbursement for any expenses incurred by him in connection with either property.[11] Thus, Press and Melnick each are entitled to a 50% share of the proceeds from the sale of the 15 Ohio and Delray Beach properties. Further, the Court rejects Melnick's argument that she should take her portion of the sale proceeds free of any liens or encumbrances and finds, instead, that any monetary liens or judgments must be satisfied equally between Melnick's and Press's share of the sale proceeds.

1. Legal Standards

Under New York law, "[a] joint tenancy is an estate held by two or more persons jointly, with equal rights to share in its enjoyment during their lives, and creating in each joint tenant a right of survivorship." *Goetz v. Slobey*, 908 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010) (internal quotation marks and citation omitted). There is a "strong presumption . . . that joint tenants hold the property in equal interests." *In re Roswick*, 231 B.R. 843, 854 (Bankr. S.D.N.Y. 1999) (citations omitted). Indeed, as explained by the New York Court of Appeals, "[i]n contrast to individual property, a joint tenant is entitled to an immediate one-half interest in the joint property." *In re Estates of Covert*, 761 N.E.2d 571, 576 (N.Y. 2001) (citations omitted). "This interest is immediately vested, entitling either tenant to a half portion, even though only one tenant may have established and contributed to the asset." *Id.* (citations omitted). Likewise, tenants in common "share a rebuttable presumption that each holds an equal undivided one-half interest in the subject premises." *C.Y. v. H.C.*, No. XX07, 2007 WL 1775506, at *1 (N.Y. Sup. Ct. May 30, 2007) (citing *Lang v. Lang*, 705 N.Y.S.2d 295 (N.Y. App. Div. 2000)). However, in contrast to a joint tenancy, a tenancy in common "represents interests in property held individually by two or more persons in which no right of survivorship exists." *People v. Rosenfeld*, 844 N.Y.S.2d 587, 595 (N.Y. Sup. Ct. 2007) (internal quotation marks and citation omitted).

Pursuant to Section 901 of the New York Real Property Actions and Proceedings Law ("RPAPL"), a person who holds property as a joint tenant or as a tenant in common may bring an action for the partition and sale of real property "if it appears that a partition cannot be made without great prejudice to the owners." McKinney's R.P.A.P.L § 901(1). The tenant seeking the partition need not be in actual possession of the property to bring

---

[11] The Court notes that even where the parties did not direct the Court to specific documents or pieces of evidence regarding their claims, the Court conducted its own extensive and independent review of the financial and other documentary evidence submitted by the parties in order to ensure that the accounting in this case is as accurate and equitable as possible.

such an action, but instead need only have a right to possession of the property pursuant to the property's title. *See Donlon v. Diamico*, 823 N.Y.S.2d 483, 484 (N.Y. App. Div. 2006); *Kurpiel v. Kurpiel*, 271 N.Y.S.2d 114, 115 (N.Y. Sup. Ct. 1966). "A partition action, although statutory, is equitable in nature and an accounting of the income and expenses of the property sought to be partitioned is a necessary incident thereof." *Worthing v. Cossar*, 462 N.Y.S.2d 920, 922 (N.Y. App. Div. 1983) (internal citations omitted); *accord Deitz v. Deitz*, 664 N.Y.S.2d 868, 869 (N.Y. App. Div. 1997). Moreover, because an action for partition is subject to equitable considerations, the Court "may compel the parties to do equity as between themselves and may adjust the equities of the parties in determining the distribution of the proceeds of the sale." *Worthing*, 462 N.Y.S.2d at 922 (internal citations omitted); *see also Hunt v. Hunt*, 788 N.Y.S.2d 219, 221 (App. Div. 2004) ("[P]artition is an equitable remedy in nature and Supreme Court has the authority to adjust the rights of the parties so each receives his or her proper share of the property and its benefits."). Stated otherwise, "[i]n a partition action, this Court sits both as a court of law, which must evaluate the wording of the deed, and as a court of equity, which must consider issues of fairness and the respective contributions of the parties." *C.Y.*, 2007 WL 1775506, at *1. Thus, while joint tenants each own an undivided one-half interest in their joint property during their lifetimes, *Covert*, 761 N.E.2d at 576, this presumption of equal interests is rebuttable upon partition of the property when the Court must weigh equitable considerations and, as stated *supra*, may compel the parties to do equity among themselves. *See, e.g.*, *Koehler v. Koehler*, 697 N.Y.S.2d 478, 485 (N.Y. Sup. Ct. 1999) ("[T]he designation of the parties as joint tenants creates a unity of estates which, upon partition, requires an equal division of the property or the proceeds of any sale. The difficulty with the defendant's case is that [this] presumption is [not] absolute and may be rebutted." (citations omitted)). The presumption of equal interests among tenants in common similarly is rebuttable upon partition. *See Laney v. Siewert*, 810 N.Y.S.2d 436, 437 (N.Y. App. Div. 2006) (evidence that defendant paid "virtually all of the apartment's purchase price and carrying costs is sufficient to rebut the presumption that the parties are entitled to an equal number of shares on partition").

As a general matter, "expenditures made by a tenant in excess of his obligations may be a charge against the interest of a cotenant." *Worthing*, 462 N.Y.S.2d at 922 (citations omitted). Likewise, where one party has received "more than his or her proper share of rents or profits derived from the property," the Court may "adjust the rights of the parties" accordingly. *Deitz*, 664 N.Y.S.2d at 869. However, while an accounting is necessary where, for example, "there is evidence that one party has received a disproportionate share of the rents or profits from real property, there must be *evidence* that the party from whom an accounting is sought *actually received* the rents and profits." *Wawrzusin v. Wawrzusin*, 623 N.Y.S.2d 255, 257 (App. Div. 1995) (emphasis added) (citations omitted). In addition, reimbursement for repairs and improvements is warranted only where the repairs and improvements "were made in good faith and were necessary to protect or preserve the property." *Worthing*, 462 N.Y.S.2d at 923 (noting that the "mere fact that the defendant has made improvements or repairs upon the property does not in itself necessarily give a right to an equitable allowance," and that "[t]here must be proof of the circumstances and need for the restoration work" (internal quotation marks, citations, and alterations omitted));

*see also Wawruzusin*, 623 N.Y.S.2d at 257 (denying reimbursement for repairs where there was insufficient evidence to support a claim for a credit and denying reimbursement for cost of an addition to the property because "a co-tenant is not entitled to an allowance for improvements which are not in the nature of repairs or restoration and are made for the co-tenant's own purposes without the agreement or consent of the other co-tenants").[12]

Ultimately, in determining the equitable division of property, "the Court may consider the nature of the parties' relationship, disparities in down payments and mortgage payments, whether any such disparate contributions to the property were intended to be a gift, the reasonable value of improvements and repairs to the property and the reasonable value of rental payments with regard to an ousted co-tenant." *In re DeVanzo*, Nos. 8-08-75665-reg, 8-09-08128-reg, 2010 WL 1780038, at *5-6

(Bankr. E.D.N.Y. May 3, 2010) (quoting *C.Y.*, 2007 WL 1775506, at *1). In other words, while the Court should consider the parties' "separate contributions to acquisition and improvement of the property," *Quattrone v. Quattrone*, 619 N.Y.S.2d 773, 774 (N.Y. App. Div. 1994), the Court also "must consider the relationship between the parties and whether the co-tenant who paid for such expenditures intended his disparate contributions to be a gift." *In re Schroeder*, No. 327294, 2008 WL 1724006, at *4 (N.Y. Surr. Ct. Mar. 26, 2008) (citation omitted).

2. Application

a. 15 Ohio

As noted *supra*, Melnick and Press own the property at 15 Ohio as joint tenants. Accordingly, the strong presumption that "joint tenants hold the property in equal interests" applies here. *In re Roswick*, 231 B.R. at 854. In addition, because this is a partition action, the Court has evaluated the equitable factors at issue and has considered not only the parties' respective financial contributions to the acquisition and improvement to the property, but also the parties' relationship and whether any alleged disparate contributions by one party could reasonably be construed as a gift to the other.

Regarding the nature of the parties' relationship, the Court finds it clear from the record that, despite defendant's effort to characterize his relationship with Melnick regarding 15 Ohio as a business partnership, Press and Melnick were involved in a long-term, quasi-marital, romantic relationship for over twenty years. Indeed, Press and Melnick already had been dating for approximately ten years and cohabitating at 15 Ohio for two years at the time that Press put Melnick on the deed for the property.

---

[12] The Court notes that although the above-cited cases regarding reimbursements for repairs and improvements involved tenants in common, rather than joint tenants, the same legal principles have been applied by New York State courts in cases involving joint tenants. *See, e.g.*, *Sharpe v. Raffer*, 893 N.Y.S.2d 674, 676 (N.Y. App. Div. 2010) (noting that "[i]n fashioning an award in a partition action, a court may consider the amount of any down payment and any mortgage payments, as well as the reasonable value of repairs and improvements made to the property" and upholding lower court's decision crediting one joint tenant with full amount of repairs and improvements made to the property); *Grishaver v. Grishaver*, 225 N.Y.S.2d 924, 933-34 (N.Y. Sup. Ct. 1961) ("As a joint tenant plaintiff is entitled to an equal share of the income and profits from the jointly owned property, and equity will afford relief to a joint tenant where the co-tenant entrusted with the common assets has usurped more than his just proportion." (internal citations omitted)).

Although they were never officially married, Press and Melnick shared the same bed, spent holidays together, took care of each other's families, and socialized together as any married couple would. Melnick's children viewed Press as a stepfather, and Press listed Melnick as the sole beneficiary of his will. Moreover, neither Press nor Melnick made any effort to keep track of who paid which bills or how much money either had contributed to the property. As described by Melnick, "[W]e lived as a couple and I helped. . . . I never watched the money. If he wanted something and I had it, I gave it to him. If I needed something and he had it, he gave it to me." (Tr. 222:17-22.) Press similarly acknowledged that he did not keep a log regarding any payments made by either Melnick or him. (*Id.* 59:6-17.) Thus, although Press and Melnick did not hold a joint bank account, the quasi-marital nature of their relationship and their lack of effort to maintain any distinctions between their respective contributions to the property are equitable considerations that weigh strongly in favor of a 50/50 division of the property.

This conclusion is further supported by a review of the evidence presented at trial regarding the parties' respective contributions to the acquisition and improvement of the property. As to Melnick's contributions, although the $70,000 that Melnick gave Press was given after she was put on the deed and was not intended as payment for her "acquisition" of an interest in 15 Ohio, it is undisputed that this sum was put toward the renovation costs at 15 Ohio and, thus, represents a substantial investment by Melnick in the property. Moreover, of the additional $204,000 in renovation costs, the Court finds that Press has failed to substantiate his claim that he paid more of these costs than Melnick did. Specifically, while Press put in checks demonstrating that he gave money to Melnick during the course of their

relationship, only four of these checks were written in 1996 and 1997, when the renovations took place, and these checks only totalled $12,200. (Def. Ex. Z, Tab 9.)[13] In any event, even assuming *arguendo* that each of the payments from Press to Melnick was intended as reimbursement for renovation costs, these checks only total $39,000, which represents less than a quarter of the $204,000 in total renovation costs. Furthermore, Press acknowledged at trial that some of the money he gave to Melnick as "reimbursement" came from the original $70,000 that she had paid to him for the renovations—clearly, Press should not receive credit for paying Melnick with funds that originally were Melnick's. Accordingly, the Court does not credit Press's testimony that he paid for most of the renovations and that Melnick did not pay for her share in 15 Ohio and, as such, finds that Press had failed to rebut the presumption that the property should be divided equally between Melnick and Press. In addition, the Court finds that, although Melnick may not have paid $157,630 "in that exact amount" for her share in 15 Ohio (Tr. 113:5-10), she contributed a substantial sum toward the property between the $70,000 payment and her payments for the renovation. Further, the Court also notes that plaintiffs introduced evidence at trial that, in 1996, the fair market value of 15 Ohio was approximately $220,000. (*Id.* 182:12-16.) Defendant introduced no evidence that this estimation was inaccurate

---

[13] Press also submitted checks made payable to himself that he claimed were actually cash payments that he gave to Melnick. Even if the Court were to credit this testimony—which, as noted *supra* in note 7 the Court does not—two of these five checks were written before April 1996, when Melnick was put on the deed. Moreover, the remaining three checks only total $4,800, which is far short of the total cost of the renovations at 15 Ohio.

or to suggest that the value of the property was greater than $220,000.[14] Consequently, based on this figure, Melnick need only have paid approximately $110,000—not $157,630—to obtain a 50% interest in 15 Ohio. Under these circumstances, the Court finds that a 50/50 division of the 15 Ohio property is equitable and appropriate.

Likewise, as to carrying costs for the property, the Court finds that Press has submitted insufficient evidence to demonstrate that he is entitled to a greater share of the sale proceeds as reimbursement for his alleged payment of these costs.[15] For example, although Press submitted evidence that he made a number of utility bill payments (Def. Ex. Z, Tab 6), there are months and even entire years for which he submitted no such checks, and, thus, defendant's evidence fails to establish that Press paid more than his share of the expenses for 15 Ohio. For example, Press submitted no evidence that he paid any utility bills from 1999 through 2004, or from 2005 through 2006, other than one payment in December 2005. In addition, for the 33 month period from April 1996 (when Melnick became a joint tenant) through December 1998, Press only submitted evidence that he paid utility bills for 20 of those months. Similarly, as to mortgage payments, Press failed to submit any evidence indicating that he made payments on the mortgage in 1996, 1997, 2006, or between February to December 2002 or

January to November 2003. Press also failed to submit evidence of mortgage payments made by him for nine months in 1998, or in March 1999, July 1999, May 2000, June 2001, June 2005, November 2005, or December 2005. Thus, Press has failed to substantiate his claim that he is entitled to reimbursement for his payment of carrying costs associated with 15 Ohio. *See Kiernan v. Martin*, 852 N.Y.S.2d 351, 351-52 (N.Y. App. Div. 2008) (upholding order directing that sale proceeds be divided equally and holding that "Supreme Court properly determined the equities between the parties" where, "[b]ased upon the trial testimony and documentary evidence, the plaintiff failed to substantiate his entitlement to a greater share of the sale proceeds as reimbursement for mortgage and tax payments he allegedly made on the subject real property, and for expenses he allegedly incurred for improvements to the subject real property"); *Frater v. Lavine*, 646 N.Y.S.2d 46, 47 (N.Y. App. Div. 1996) (finding that plaintiff "failed to put forth any evidence, other than conclusory allegations, to substantiate her claim that she is entitled to reimbursement for money she allegedly gave the defendant toward the down payment and purchase of the property").

In any event, even assuming *arguendo* that Press paid a greater proportion of the carrying costs than Melnick, the Court finds that it would be inequitable to require Melnick to reimburse Press for these costs. As already discussed, Press and Melnick were involved in a quasi-marital relationship that spanned two decades, and, given the absence of any credible evidence that Press expected to be repaid for his contributions to the property, the Court finds that any payments made by Press toward the property in which they cohabitated were gifts to Melnick. *Cf. Rettig v. Holler*, No. 126865/02, 2003 WL 22976599, at *3 (N.Y. Sup. Ct. Sept. 16, 2003) (noting that "the

---

[14] In fact, when asked whether he was "charging [Melnick] $157,630 in 1996 for a property that was only worth $220,000 in total," Press admitted "[t]hat is correct." (Tr. 363:2-5.)

[15] As stated on the record during trial, in reaching its decision here, the Court has not considered any payments made by Press for the 15 Ohio property prior to the time when Melnick became a co-owner of the property in April 1996.

requisites for a valid gift inter vivos are [i] intent on the part of the donor to give; (ii) delivery of the property given, pursuant to such intent; and (iii) acceptance on the part of the donee"). Furthermore, during the course of their relationship, Press and Melnick made no effort to keep track of who was making which payments, and Press cannot now retroactively claim that he intended to maintain a business-like relationship with Melnick with regard to the property and intended to keep his contributions to the property separate from Melnick's. In so holding, the Court finds instructive the decision in *C.Y. v. H.C.* In that case, plaintiff and defendant were a same-sex couple who owned the townhouse that they lived in as tenants in common. 2007 WL 1775506, at *1. As an initial matter, unlike in this case, defendant was able to establish a significant disparity in the parties' contributions toward the down payment which, the court held, warranted an unequal division of sale proceeds. *Id.* at *2. However, the court nevertheless found that defendant was "not entitled to a credit for any disparities in payments made by the parties to carry and maintain the townhouse after the couple moved in and before [plaintiff] left." *Id.* at *3. In so holding, the court noted explained, *inter alia*:

> In terms of how they lived their lives, they essentially considered themselves married and operated as a couple. They lived together with [defendant's] two children from a previous relationship and [plaintiff] gave birth to a child before the parties separated. They held themselves out as, and were, in all respects, a family. . . . During the parties' relationship, neither party made any attempt to keep track of exactly how much money each was contributing to the running of the household. [Defendant], who

admittedly earned more money and therefore contributed more money, took no steps to contemporaneously record who paid which bills and from whose account they were paid. Nor is there any evidence that she kept any contemporaneous records to suggest that the parties contemplated anything other than a 50/50 division. . . . In fact, [plaintiff] credibly testified that, after they moved into the townhouse, there was no consideration given as to whose money was whose. If [plaintiff] needed more money for household or townhouse expenses, she would ask [defendant] or she might pay the bill herself if she had the funds. Although [defendant] now claims that the parties had an oral agreement that any disparate contributions for the townhouse would be "equalized" in the event of a breakup, the Court does not credit that testimony.

*Id.* at *3. This Court agrees with the reasoning of the court in *C.Y.* and finds that a 50/50 division of the property without reimbursement for carrying costs paid during the course of the relationship is appropriate in this case. *See also Hufnagel v. Bruns*, 542 N.Y.S.2d 652, 654 (N.Y. App. Div. 1989) (award to respondent for reimbursement of maintenance payments made during time parties cohabitated was unwarranted where "[t]he evidence establishe[d] that during the time that appellant and respondent lived together, respondent voluntarily paid all of appellant's expenses, including those associated with the cooperative loft. Respondent continued to do so even after he had left the apartment until the time he was locked out by appellant . . . . There is no evidence that appellant ever agreed or was expected to reimburse

respondent for her living and other expenses.").[16]

However, the Court finds that Melnick is not entitled to a share of the monthly rental income that Press has received from a tenant living in an apartment at 15 Ohio after Melnick vacated the property. Although defendant admitted that he had received $1,000 per month in rental income from this tenant (Tr. 385:16-19), the Court notes that Melnick voluntarily abandoned the property in August 2006 when she decided to end her relationship with Press and has not made any payments toward the property since that time. (*Id.* 256:3-11.) Press also credibly testified that he used the rental income to pay the taxes on the property since Melnick left. (*Id.* 385:16-22.)[17] Therefore, in light of the use of the rental income to pay taxes on the jointly held property, the Court finds that it would be inequitable to require Press to pay Melnick a portion of the rental proceeds he has received on the property.

Furthermore, as to any payments allegedly made after the end of their relationship, although the Court finds that Press has presented sufficient credible evidence to demonstrate that there were tax obligations for which he received no contribution from Melnick and which were paid using the rental income from the apartment at 15 Ohio, Press has failed to demonstrate through credible evidence whether he incurred any additional expenses—including mortgage, tax, or other expenditures—for which he would be entitled to reimbursement. In particular, the Court finds that Press is not entitled to reimbursement because he has not submitted sufficient evidence to demonstrate that he made any such mortgage or other payments after the time that Melnick moved out that were in excess of the $1,000 in rental income he has been receiving since April 2008. *Cf. Wawruzusin*, 623 N.Y.S.2d at 257.[18] Instead, the only post-2006 receipts submitted by Press pertained to repairs made to the property in 2007 and 2008. However, the Court finds that Press is not entitled to reimbursement for these expenses beyond the rental income amount because he has failed to demonstrate that all of these repairs—which included replacing the living room floor, renovating the kitchen counter, repairing cracks on the sidewalk, and repairing stucco on the outside of the house (Tr. 349:12-351:23)—were "necessary to protect or preserve the property." *Worthing*, 462 N.Y.S.2d at 923. Indeed, many of these renovations appear to be cosmetic repairs or

---

[16] The conclusion that the parties never intended anything other than an equal division of property between them and that Press never intended to be reimbursed for his expenses is further supported by the fact that Press also gifted Melnick an interest in 17 Ohio. (Tr. 106:25-107:2; 254:9-15.) Indeed, it is undisputed that Melnick paid $40,000 toward the mortgage at 17 Ohio and that the mortgage was taken out to pay for the renovations at 15 Ohio. (*Id.* 215:22-24; 221:11-22; 314:19-315:1; 370:19-371:7.) Although Melnick ultimately transferred her interest in 17 Ohio back to Press, this transfer of property and comingling of funds between the properties further supports the Court's conclusion that a 50/50 division of property here is both warranted and equitable.

[17] In addition to Press's testimony, there is also documentary evidence in the record reflecting certain taxes that were owed on 15 Ohio. (*See* Def.'s Ex. 17; Tr. 450:2-5.)

[18] The Court notes that Melnick did admit that she has not paid any bills or made any other payments in connection with 15 Ohio since she moved out in August 2006. (Tr. 256:3-11.) However, the fact that Melnick has not made any such payments does not necessarily establish that Press made payments that were in excess of the rental income he has obtained from the property since April 2008.

repairs intended to fix minor problems with the property, and the Court finds that Press has failed to provide for some of them "proof of the circumstances and need for the restoration work." *Id.*[19] In fact, many of these payments (such as utility payments) may have simply related to his ongoing, personal use of the house, expenses for which Press is not entitled to reimbursement. In any event, with respect to any mortgage payments he continued to make or these other expenditures, Press has failed to demonstrate that the rental income from the tenant living at 15 Ohio was insufficient to cover such payments and expenditures.

Accordingly, having evaluated the equitable considerations in this case and the financial evidence submitted by the parties, the Court finds that Press has failed to rebut the strong presumption that the sale proceeds of 15 Ohio, which Press and Melnick own as joint tenants, should be divided equally between them. Thus, Melnick and Press are each entitled to 50% of the proceeds derived from the partition and sale of the property, without reimbursement for any alleged carrying costs, payments, or rental income paid or received by the parties. The Court also rejects Melnick's contention that Press must satisfy the HELOC on the property out of

his share and that she is entitled to her 50% share free of any liens or encumbrances. As discussed in greater detail *infra*, the home equity line of credit is attached to the entire property at 15 Ohio, and although Melnick did not sign the note for the HELOC—and therefore had neither a right to access the line of credit nor any obligation to re-pay it—the evidence shows that Melnick did sign a mortgage in connection with the HELOC, which gave the bank the right to foreclose on the property should Press default on his repayment obligations. In fact, as a deeded co-owner of the property, Melnick not only was aware that Press was taking out a HELOC on the property, but also had to approve the attachment of the HELOC to the property. Moreover, the Court finds that the funds from the HELOC were used to pay for expenses at the 15 Ohio property and other day-to-day expenses during Press and Melnick's quasi-marital relationship, and Melnick therefore benefitted directly from these funds and knew such funds were being used for those purposes. Under these circumstances, the Court finds that it would be equitable for any remaining balance on the HELOC to be repaid equally from Melnick's and Press's shares of the sale proceeds from 15 Ohio.

Finally, the Court rejects Melnick's argument that she was ousted from the property by Press and is entitled to rental income from Press for his exclusive occupancy of 15 Ohio since August 2006. As a general matter, upon the ouster of one co-tenant from the property by the other co-tenant, the remaining tenant becomes liable for all charges assessed against the property and owes the ousted co-tenant one-half of the reasonable rental value of the property. *See C.Y.*, 2007 WL 1775506, at *5; *Hufnagel*, 542 N.Y.S.2d at 654. Here, Melnick alleges that Press's abusive and threatening behavior toward her caused her to be ousted from the 15 Ohio property.

---

[19] Melnick also argued that Press should not be entitled to reimbursement for payments made after Melnick moved out in August 2006 because Press ousted Melnick from the property and, accordingly, "became responsible for paying all charges assessed against the property, including the reasonable value of [his] exclusive use and occupancy." *C.Y.*, 2007 WL 1775506, at *5 (citations omitted). However, as set forth *infra*, the Court finds that Press did not oust Melnick. Accordingly, the Court declines to rely upon this alternative ground for finding that Press is not entitled to reimbursement.

However, the Court rejects this argument and finds that plaintiff left 15 Ohio voluntarily and of her own volition and was not ousted or constructively evicted because of Press's allegedly abusive behavior. Specifically, although the Court credits Melnick's testimony that Press's personality had changed in the final years of their relationship due, in large part, to Press's use of pain medication, the Court did not find credible the testimony presented regarding Press's abuse of Melnick and finds, instead, that even if Press had become "nasty" and "erratic," his behavior and Melnick's resulting decision to leave him did not constitute an ouster.

As an initial matter, much of the testimony regarding Press's abuse was largely conclusory, and when witnesses were asked to corroborate their allegations with specific examples, they either were unable to do so, or provided examples of minor fights that did not involve any threatening behavior toward Melnick. For example, Eric Schwimmer recounted one incident wherein Press broke a door trying to get into the lower apartment at 15 Ohio because "he needed to get water because he kept his water bottles in the refrigerator downstairs in the basement." (Tr. 195:7-22.) Even assuming that this incident occurred as described, there is no evidence that Press directed this alleged anger toward Melnick.

Likewise, Gail Denker ("Denker"), a friend of Melnick's, was able to describe only one incident when she saw Press become "very agitated" at Melnick. (*Id.* 154:15-16.) Specifically, Denker testified that, in the fall of 2005, when Press was at the Delray Beach property supervising repairs to the home after Hurricane Wilma, Press became angered at Melnick when Melnick arrived unannounced at the house in Florida. (*Id.* 153:20-154:17.) Denker described that, when Press saw Melnick, he became very upset and began screaming words to the effect of "What the F are you doing here? You didn't have to come here. You could have stayed home. I don't need you here."[20] (*Id.* 154:22-155:1.) Notably, however, Denker—a self-admitted "very nervous type of a person" (*Id.* 156:10)—did not call the police because, in her words, "I didn't feel that I had to call . . . [T]hey were just – you know, he was just yelling and all." (*Id.* 155:9-11.) Additionally, Melnick told Denker shortly after the incident that "everything's fine" and that "everything [had] quieted down." (*Id.* 156:5-8.) In fact, based on Denker's testimony, it appears that Denker was more upset about the incident than Melnick was at that time. (*Id.* 156:1-12 ("[S]he said, don't worry. I'll be okay. . . . I, like, drove slow waiting to see if she'll call and then I called her back and she said everything's fine, you know, everything quieted down. You know, she didn't want me, I guess, to get involved because I'm a very nervous type of a person. So I was very upset over it because I never seen anything like this.").) Thus, even if Press did become angry as described by Denker, the Court finds that the incident, when considered in light of the totality of the evidence, certainly does not rise to the level of abusive behavior that could result in an ouster.

Furthermore, although Harriet Kovel testified that Press "tortured" Melnick and Melnick was "terrified" of him (*id.* 167:3-5; 168:1-3), she was unable to provide any details as to why she had come to this conclusion, other than to testify that Press's behavior was "erratic" (*id.* 169:20) and that

_____

[20] Press testified that he became angry because he had left Melnick in charge of renovations at 15 Ohio to fix an on-going leak and she had abandoned the house and left the workers unsupervised.

Melnick had come to Kovel's house on several occasions to spend the night. (*Id.* 167:7-8.) With regard to one night when Kovel found Melnick sleeping on Kovel's front porch, Kovel only stated that Melnick was "afraid to go home," but provided no additional explanation as to why Melnick had left her house that evening. (*Id.* 167:16-24.) In fact, Melnick herself could not even remember the exact reason why she had chosen to sleep on Kovel's porch and testified that she might have done so after Press yelled at her for attempting to clean the house. (*Id.* 235:16-236:2.)

In addition, the testimony regarding Press's behavior and Melnick's decision to leave him was internally inconsistent in material respects. By way of example, although Melnick testified that she "left with nothing, not even my own furniture," she later admitted that, in or around July 2006—approximately one month before she moved out—she began to pack many of her belongings, including her summer clothing, her art supplies, and her bike, and later had those belongings brought down to Florida by truck. (*Id.* 237:14-16; 266:6-10; 266:18-267:1.) It is also undisputed that, when Melnick told Press she was leaving, it was Press who drove Melnick to her friend's house that evening. (*Id.* 237:17; 266:14-16; 339:14-25.) Thus, far from fleeing her home to escape Press's allegedly abusive behavior, Melnick's decision to leave was methodical and planned—she not only took the time to pack some of her belongings and have those belongings picked up by movers and shipped to Florida, but also requested that Press, her alleged abuser, drive her to a friend's house when she was leaving. In fact, Melnick's own testimony revealed that she made the decision to leave the home voluntarily, after her efforts to salvage her relationship with Press failed. In particular, Melnick testified "I said to go to therapy with me. I asked him to try and give me

reasons to stay with him. I was 61. I didn't want to give up on him." (*Id.* 237:6-8.) Indeed, as further evidence that Melnick was not involuntarily ousted from the property, Melnick explained that she never went back to retrieve her other belongings not because she was afraid or frightened or did not have access to the house, but instead merely because she "didn't want to go back" because "[t]hey were only things." (*Id.* 238:2-5.)

Finally, although it is clear that Press changed the locks for the property at some point after Melnick moved out (*id.* 383:7-22), there is no evidence as to why Press decided to change the locks. Further, there is no evidence that Press ever affirmatively denied Melnick access to the property or that he informed her that he was excluding her from the house. In fact, Melnick admitted that she was not even aware that the locks for the house had been changed until either her lawyers or her broker told her. (*Id.* 238:20-24.) In addition, when Melnick came by the property unannounced sometime in 2008—after the current action had been initiated—Press indicated to Melnick that she could enter the property, but requested that she contact his attorney first to make arrangements to do so. (*Id.* 341:9-342:10.) Press credibly testified that he asked Melnick to make arrangements with his attorney because "after everything that had transpired, I was afraid that she would say that I did something. I hit her or I threatened her or did something." (*Id.* 342:11-13.)

Accordingly, under these circumstances, the Court finds that Melnick has failed to establish that she was ousted from 15 Ohio, and Melnick therefore is not entitled to rental income from Press for his occupancy of 15 Ohio since August 2006. *See Perkins v. Volpe*, 536 N.Y.S.2d 845, 846 (N.Y. App. Div. 1989) (finding no ouster where even

though defendant exclusively occupied premises and changed the locks in co-tenant's absence, testimony was inconsistent as to why the locks had been changed and defendant "never interfered with the plaintiff's right to possess the property nor did he ever communicate to her his claim of sole ownership").

b. Delray Beach[21]

Melnick and Press own the Delray Beach property as tenants in common and, as such, they "share a rebuttable presumption that each holds an equal undivided one-half interest in the subject premises." *C.Y.*, 2007 WL 1775506, at *1. As with the 15 Ohio property, the Court finds that Press has failed to rebut this presumption and, accordingly, Melnick and Press are each entitled to 50% of the sale proceeds of the house. Specifically, although the record reveals that Press put down most of the money for the purchase of the home and made a number of payments toward carrying costs for the property, he did so after he and Melnick had been dating for approximately fifteen years and cohabitating for eight years and, accordingly, the Court finds that any disparate contributions made by Press were gifts to Melnick. Moreover, the Court recognizes that Melnick contributed $9,000 toward the down payment and approximately $10,000 toward the mortgage payments for the property. Further, as with the 15 Ohio property, Press and Melnick made no effort to separate the payments they made in connection with the property or to keep track of whether one owed the other money. Therefore, the Court finds that the equitable outcome is to evenly divide the proceeds from the sale of the Delray Beach property between Press and Melnick. However, the Court notes that this conclusion may be rendered moot by the fact that no mortgage payments have been made on the Delray Beach property since in or about March 2007 and, accordingly, the property is going into foreclosure.[22]

[21] Although the Delray Beach property is located in Florida, both plaintiffs and defendant rely upon New York law in their arguments, and neither argues that Florida law should apply to the partition of the Delray Beach property. In any event, the Court notes that, as in New York, actions for partition in Florida are equitable in nature and the applicable law is substantially similar between the two states. *See, e.g.*, Fla. Stat. § 64.011 ("All actions for partition are in chancery."); Fla. Stat. § 64.071 (setting procedures for sale of property for which partition cannot be made without prejudice to the owners); *Schroeder v. Lawhorn*, 922 So.2d 285, 293 (Fla. Dist. Ct. App. 2006) ("An unequal division of the property may even be justified where one cotenant has improved the property to be divided without contribution by the other cotenant or cotenants. Under these circumstances, the party who made the improvements should receive the benefit of the enhancement he or she has made to the value of the property if that result can be achieved equitably."); *O'Donnell v. Marks*, 823 So.2d 197, 199 (Fla. Dist. Ct. App. 2002) ("To determine the allocation of the proceeds of the partition sale, the court must apply this court's two-step procedure set forth in *Biondo v. Powers*, 743 So.2d 161 (Fla. 4th DCA 1999). The first step is to determine each party's percentage of ownership of the property. The trial court found the split to be 50/50 and, therefore, each had an interest amounting to $105,000, half the $210,000 value determined by the trial court. The next step requires the court to determine the reimbursable expenses incurred after closing and calculate each party's proportionate share using each party's percentage of ownership, i.e., fifty percent for each party. That amount is then subtracted from appellant's one-half interest in the property and given to appellee.").

[22] Moreover, as with the 15 Ohio property, the Court finds that Press has submitted insufficient

## B. Constructive Trust on 16 Nevada

Melnick and Lonnie argue that a constructive trust should be imposed in either one or both of their favors on the 16 Nevada property. Specifically, plaintiffs contend that, first, Lonnie only transferred the 16 Nevada property to Press in reliance on Press's alleged promise that he would put Melnick on the deed at a later date, and, second, that because Press reneged on that promise, allowing Press to keep the property would unjustly enrich Press. For the reasons set forth below, the Court disagrees and finds that no promise was made by Press to Lonnie with respect to the property and, in any event, Press—who paid for all expenses associated with the house—would not be unjustly enriched if he were allowed to keep the property solely in his name. Moreover, because the Court finds that a constructive trust should not be imposed on the property, plaintiffs' additional request for the partition of the property is rendered moot.[23]

---

evidence to demonstrate that he paid more than his share of the maintenance and carrying costs for the property, and, accordingly, the Court finds that Press is not entitled to reimbursement for any such payments.

[23] Defendant raised a standing issue with respect to this claim in his reply papers on summary judgment. However, because this issue was raised for the first time in reply, the Court declined to reach this issue in its order denying summary judgment. Here, the Court notes that, to the extent Lonnie is seeking to impose a constructive trust solely for the benefit of his mother, he does not have standing to do so. *See In re Schick*, 246 B.R. 41, 46 (Bankr. S.D.N.Y. 2000) ("The personal nature of the equitable right prevents someone other than the beneficiary from using it offensively or defensively. Thus, a stranger cannot sue to impose a constructive trust for the benefit of a defrauded party."). Moreover, Melnick neither held actual title to the property nor expended

## 1. Legal Standards

A constructive trust is an equitable remedy that may be imposed "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest." *Watson v. Pascal*, 886 N.Y.S.2d 440, 441 (N.Y. App. Div. 2009) (internal quotation marks, alterations, and citations omitted); *see also Marini v. Lombardo*, 912 N.Y.S.2d 693, 696 (N.Y. App. Div. 2010) ("A constructive trust is an equitable remedy and its purpose is to prevent unjust enrichment." (internal citations omitted)). Under New York law, the requisite elements of a constructive trust are: "(1) a confidential or fiduciary relationship; (2) a promise, express or

---

any time, funds, or effort in connection with the property, and, accordingly, does not have a sufficient interest in the property to succeed on a claim for a constructive trust. *Cf. Lester v. Zimmer*, 542 N.Y.S.2d 855, 856-57 (N.Y. App. Div. 1989) (constructive trust may be imposed where plaintiff did not relinquish actual interest in property but nonetheless contributed funds, time and effort toward construction of property); *Washington v. Defense*, 540 N.Y.S.2d 491, 492 (N.Y. App. Div. 1989) (where plaintiff had not held actual title but had expended money, labor, and time in construction of house, imposition constructive trust was proper). However, plaintiffs have not restricted their constructive trust claim to Melnick or claims on her behalf, but instead have requested that the Court impose a constructive trust in favor of Melnick *and/or* Lonnie. Lonnie, here, was not a stranger to the transaction and, in fact, held actual title to the property prior to its transfer. Accordingly, the Court construes plaintiffs' claim for a constructive trust as being raised by Lonnie on behalf of himself as the transferor of the property, a claim for which Lonnie has standing. In any event, for the reasons stated herein, the Court finds that plaintiffs' claim for a constructive trust fails on the merits.

implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992) (collecting cases). However, these elements serve only as "guideline[s]," and "a constructive trust may still be imposed even if all of the elements are not established." *Marini*, 912 N.Y.S.2d at 696; *accord In re Koreag*, 961 F.2d at 352 ("Although these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.'" (quoting *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978)) (additional citations omitted)).

A plaintiff is not required to have had an actual interest in a property to assert a claim for constructive trust. *See Kasan v. Perlin*, 877 N.Y.S.2d 851, 856 (N.Y. Sup. Ct. 2009) ("The Court has considered the defendants' argument that the plaintiff is required to have an interest in the property prior to the imposition of a constructive trust, but finds that this is not a prerequisite." (citing *Henness v Hunt*, 708 N.Y.S.2d 180 (N.Y. App. Div. 2000))). Instead, courts have held that a constructive trust may be imposed where "funds, time and effort are contributed in reliance on a promise to share in the result." *Lester v. Zimmer*, 542 N.Y.S.2d 855, 856 (N.Y. App. Div. 1989); *see also Washington v. Defense*, 540 N.Y.S.2d 491, 492 (N.Y. App. Div. 1989) (imposition of constructive trust was proper even where plaintiff "never had actual title" because, nevertheless, "plaintiff's interest in the property [was] overwhelmingly established by virtue of [her] expenditure[]" of money, labor, and time in the construction of the house). Thus, the law of constructive trusts is "not confined to reconveyance situations," *Lester*, 542 N.Y.S.2d at 856, where a party transferred property to which he held title solely in reliance on a promise to reconvey that property at a later time. *Cf. Fairfield Fin.*

*Mortg. Grp., Inc. v. Luca*, 584 F. Supp. 2d 479, 486 (E.D.N.Y. 2008) (promise sufficiently alleged where plaintiff claimed that defendant "promised not to utilize [plaintiff's] resources for purposes other than [plaintiff's] interests").

### 2. Application

The parties here do not dispute the existence of a confidential relationship between Press and Lonnie. However, as to the second element of a constructive trust, the Court finds that plaintiffs have failed to prove the existence of a promise between Press and Lonnie with respect to 16 Nevada. As an initial matter, the Court recognizes that a promise for purposes of a constructive trust need not be express, but instead may be an implied promise inferred from the circumstances surrounding the transfer of the property. *See Brand v. Brand*, 811 F.2d 74, 78 (2d Cir. 1987). However, in this case, the Court finds that plaintiffs have failed to present sufficiently credible evidence to establish by a preponderance that Press made a promise to Lonnie that he would ultimately give an interest in the property to Melnick, or to allow the Court to infer as much from the circumstances surrounding the transfer. First, Melnick— who is alleged by plaintiffs to be the ultimate beneficiary of the transfer of 16 Nevada—was a stranger to this transaction. She paid no money to the purchase of the property, paid no funds toward expenditures, and, other than one possible conversation with Lonnie, appeared to play no role in the negotiations leading up to the transaction. Second, not only did Melnick not expend any funds in connection with the acquisition or transfer of 16 Nevada, but Lonnie also admitted that he, too, had no out-of-pocket expenses in connection with the property. Indeed, even the $10,000 that Lonnie claims he loaned Press for the down payment—a claim which Press denies—was repaid by

Press within eight months to a year of the purchase of the property. Press, in other words, funded the entire purchase and paid for the maintenance of the property. Finally, the Court did not find Lonnie's testimony regarding the details of the promise to be credible. In particular, Lonnie's description of the alleged promise was vague and provided few details about what Press had actually said to Lonnie to lead Lonnie to believe that his mother would ultimately acquire an interest in 16 Nevada. Accordingly, given the credible evidence — including Melnick's complete absence from the transaction and Lonnie's lack of any financial exposure—the Court rejects plaintiffs' contention that they expected to have a future interest in the property and that Lonnie only transferred the property because of a promise that Press would later transfer an interest to Melnick.

Moreover, the Court also finds that plaintiffs have failed to establish that Press would be unjustly enriched if he were allowed to retain sole possession of 16 Nevada. Under New York law, "to prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Marini*, 912 N.Y.S.2d at 697 (internal quotation marks, citations, and alterations omitted). As explained by the Second Circuit, this element "lies at the heart of the equitable remedy of a constructive trust," and "'[i]t is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion.'" *Brand*, 811 F.2d at 80 (quoting *Sinclair v. Purdy*, 139 N.E. 255, 258 (N.Y. 1923)). Here, it is undisputed that Press paid for all financial expenditures related to 16 Nevada and that Lonnie ultimately had no financial exposure in connection with the property. Although Lonnie stressed that he could have been held liable if someone had been injured on the property or if Press had missed a mortgage payment, neither of these hypothetical possibilities materialized, and, at the time of transfer, Lonnie had expended no money whatsoever for the acquisition or maintenance of 16 Nevada. Moreover, Lonnie enjoyed the benefit of possessing the property for three years, while Press paid for all of the property's expenses.

Under these circumstances, where Press paid for the purchase of the property and its upkeep—including mortgage payments, taxes, and any other expenses—and where Lonnie ultimately had no exposure, financial or otherwise, in connection with the property—and, in fact, admitted that "everything was handled" for the property by Press (Tr. 90:13-15)—the Court finds that it would not be against equity or good conscience to allow Press to retain the property. In fact, if Lonnie were permitted to impose a constructive trust on 16 Nevada, he would receive an unjustified windfall for an investment that he did not pay to either purchase or maintain. Indeed, at least one court found unjust enrichment to exist where a party in an analogous position to *plaintiffs* in this case was allowed to retain an interest in a property and, thus, found a constructive trust in favor of the defendant. In *Hornett v. Leather*, 535 N.Y.S.2d 799 (N.Y. App. Div. 1988), the defendant, a married man, had been dating plaintiff for several years when he purchased a home for them to live in together. *Id.* at 800. Defendant paid for the acquisition of the property, acquired a mortgage, and paid for all expenses associated with the property. *Id.* Three years later, defendant transferred the property to himself and plaintiff as joint tenants, with the understanding that, if their relationship ended, plaintiff would reconvey her title in the property to defendant. *Id.* at 800-01. During the course of their

relationship, defendant also paid for vacations and automobiles for plaintiff, and supported plaintiff while she attended law school. *Id.* Ultimately, plaintiff and defendant ended their relationship, but plaintiff refused to reconvey her interest in the property, and defendant sued to impose a constructive trust. In holding that a constructive trust should be imposed, the court explained that allowing the plaintiff to retain her interest in the property would be unjust:

> Plaintiff received one-half ownership in a valuable piece of property for which her financial contributions were, if anything, minimal. . . . The fact that the transfer allegedly resulted in plaintiff becoming liable on the mortgage does not create a situation where unjust enrichment cannot be found where, as here, plaintiff has never been requested to assume any of the mortgage payments and the debt is current.

*Id.* at 801-02 (citations omitted). Similarly, plaintiffs in this case are asking for the Court to impose a constructive trust on a property for which their financial contributions were minimal (considering that the only money allegedly contributed by Lonnie was repaid), and for which they have no liability and have never been requested to assume any of the payments. Thus, in this case, not only is it not unjust to allow Press to retain his interest, but it, in fact, would be unjust to provide plaintiffs with an interest in the property through the imposition of a constructive trust. Accordingly, plaintiffs' request for a constructive trust on 16 Nevada is denied.

## C. Conversion

Melnick has brought two claims based upon a theory of conversion. First, Melnick

argues that Press should be responsible for re-paying any obligations on the 15 Ohio HELOC because Press wrongfully converted those funds for his own use. Second, Melnick contends that the Court should enter a judgment in her favor in the amount of $32,084.26 for Press's wrongful conversion of Melnick's share in the insurance proceeds received for the hurricane-related damage of the Delray Beach property. For the reasons set forth below, the Court rejects both of these arguments and finds in favor of defendant on these claims.

### 1. Legal Standards

"A conversion takes places when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) (citation omitted); *see also Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) ("According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (N.Y. 1995))). A claim for conversion includes a "denial or violation of the plaintiff's dominion, rights, or possession" over her property, *Sporn v. MCA Records, Inc.*, 448 N.E.2d 1324, 1326 (N.Y. 1983) (internal quotation marks and citation omitted), and "requires that the defendant exclude the owner from exercising her rights over the goods." *Thyroff*, 460 F.3d at 404 (citing *New York v. Seventh Regiment Fund, Inc.*, 774 N.E.2d 702, 710 (N.Y. 2002)). Thus, "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the

property or interference with it, in derogation of plaintiff's rights." *Colavito*, 860 N.E.2d at 717 (citations omitted).

### 2. Application

#### a. HELOC Funds

Melnick contends that she should not be responsible for paying any portion of the remaining obligation on the HELOC because Press wrongfully converted these funds for his own use by using these funds to pay for racehorses and related expenses. In support of this argument, Melnick notes that the HELOC was not taken out in her name and that Press was the only one who had the ability to write checks using the line of credit. (PTO 7.V.) Press, in contrast, argues that Melnick is jointly liable for any outstanding balances or obligations owed to Bank of America in connection with the HELOC. For the reasons set forth herein, the Court agrees with Press and rejects Melnick's claim for conversion.

Specifically, as already explained *supra*, the Court finds that Melnick and Press are jointly liable for the HELOC, and Press did not take any such money without Melnick's authorization. Melnick was fully aware that Press was taking out a HELOC against 15 Ohio and she not only approved of the HELOC but, in fact, signed the mortgage in connection with the line of credit. The HELOC funds were also used to Melnick's benefit, given that they were used in large part to pay for carrying costs for the property that she lived in and co-owned with Press. Finally, the Court finds that Melnick failed to establish that she did not approve of Press's use of the funds for racehorses and related expenses. Press testified credibly that, during their relationship, Melnick was aware of Press's use of the funds for racehorses and that she not only approved of this use but also engaged in betting on

racehorses and other related activities. Accordingly, the Court rejects Melnick's claim for conversion of the HELOC and holds that both Melnick and Press are jointly liable for paying any outstanding balances owing to Bank of America.

#### b. Insurance Proceeds

Melnick argues that Press should be held liable to her for failing to provide Melnick with her share of the insurance proceeds that were not used to repair the Delray Beach property. Specifically, Melnick contends that, although $214,168.53 in insurance proceeds were issued to Melnick and Press, only approximately $110,000 of those proceeds were used for renovation of the Delray Beach property, and she alleges that Press wrongfully deposited the unused proceeds into his account and has refused to provide Melnick with her 50% share of those funds.[24]

Having reviewed the evidence presented at trial, the Court finds that plaintiff has failed to establish that a portion of the insurance proceeds was not used for repairs on the Delray Beach property or that Press has retained any of those proceeds to Melnick's detriment. Specifically, the Court does not credit Melnick's testimony that only approximately $110,000 of the proceeds were used for renovations of the

---

[24] Melnick notes that Press gave her $20,000 in or around the time that she moved out of 15 Ohio, and she contends that this amount was a partial payment of the outstanding insurance proceeds allegedly owed to her. Press acknowledges that he gave Melnick $20,000, but he claims that this amount was a loan requested by Melnick and that this payment was unrelated to the insurance proceeds. In any event, because the Court finds, as set forth *supra*, that Melnick has not established a claim for conversion, the Court need not resolve this dispute.

property. Melnick's only basis for this belief was the fact that she had seen "a lot of the bills" for the repairs while she was in Florida. (Tr. 284:3-16.) However, she provided no specific details regarding what those bills were, and the Court has no assurance that the bills Melnick saw represented the entirety of all bills for the reconstruction. Moreover, Melnick herself admitted that she had "guesstimated" this figure. (*Id.* 230:8-15.) In addition, Press testified regarding the extensive repairs that were needed after the hurricane, and the Court found credible Press's testimony that all of the proceeds received were used to complete reconstruction of the property. Accordingly, the Court rejects Melnick's claim that Press wrongfully converted the Delray Beach insurance proceeds.

## IV. CONCLUSION

For the reasons set forth herein, the Court concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that: (1) the property at 15 Ohio Avenue should be partitioned and sold and the proceeds should be divided equally between Melnick and Press, after payment of any remaining liens or encumbrances; (2) neither Press nor Melnick is entitled to reimbursement for any payments of carrying costs or other expenses associated with 15 Ohio, or for any rental income allegedly received from the property; (3) Press did not oust Melnick from 15 Ohio; (4) the Delray Beach property should be partitioned and sold and the proceeds should be divided equally between Melnick and Press, after payment of any outstanding mortgages, liens, or encumbrances; (5) Press is not liable to Melnick for conversion of insurance proceeds related to the Delray Beach property; (6) Press is not liable to Melnick for conversion of funds from a home equity line of credit on the 15 Ohio property; and (7) plaintiffs are not entitled to a constructive trust on the property located at 16 Nevada Avenue. Moreover, given the Court's findings, plaintiffs' claim for punitive damages regarding the fraudulent taking of the Delray Beach insurance proceeds and the 16 Nevada property is rendered moot.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: August 12, 2011
      Central Islip, New York

***

Plaintiffs are represented by Gerard Schiano-Strain, Wagner, Davis P.C., 99 Madison Ave., 11th Floor, New York, NY 10016. Defendant is represented by David H. Perlman, 186 Montague Street, 4th Floor, Brooklyn, NY 11201.